# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

JANET ROLLAND and MICHAEL HARTY,
individually and on behalf all others similarly
situated,

                Plaintiffs,

      v.

SPARK ENERGY, LLC,

              Defendant.

Civil Action No. 17-2680 (MAS) (LHG)


**THIRD AMENDED
CLASS ACTION COMPLAINT
AND JURY DEMAND**

---

Plaintiffs Janet Rolland and Michael Harty (collectively, "Plaintiffs") bring this action against Spark Energy, LLC ("Defendant" or "Spark"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege with personal knowledge as to their own actions, and upon information and belief as to those of others, as follows:

## NATURE OF THE CASE

1.     This action seeks to redress Spark's deceptive pricing practices that have caused thousands of consumers to pay considerably more for their electricity than they should otherwise have paid.

2.     Defendant engages in a classic bait-and-switch deceptive marketing scheme aimed at consumers hoping to save on the cost of electricity.  It lures consumers into switching by offering a teaser rate for a limited number of months and initially lower than local utility rates for electricity.  Once that initial rate expires, Spark switches its customers over to a "competitively priced" "variable market rate" that "may vary according to market conditions."  A reasonable consumer thus expects that after the initial rate expires, he or she will receive a

variable rate that might vary from the teaser rate that he or she was receiving, depending on whether market conditions had changed; that is, a variable market rate.  Thus, a reasonable consumer would expect that Spark's variable market rate would reflect market conditions, including wholesale market rates and the rates other competitive market participants charge (including local utilities).

3.     But what Spark does not inform customers is that its variable rate is invariably substantially higher than the initial teaser rate, that it does not fluctuate based on changes in the wholesale market, and that it does not vary according to other market rates because Spark's rate is significantly higher than the rates local utilities charge and the rates most other independent energy service companies charge (including Spark's own fixed rates).

4.     Plaintiffs and reasonable consumers were also misled and deceived because Spark's variable rate never materially varies based on market conditions because the variable rate does not vary based on changes in competitors' rates and it does not vary based on changes in wholesale rates.  Instead, Spark just raises the rate as high as it thinks it can without causing its customers to quit and it leaves the rate high no matter what happens with its competitors' rates or the wholesale market rates.  No reasonable consumer would expect that there would be no connection between market conditions and Spark's variable rates.

5.     Spark further deceives its variable rate customers by charging them monthly administrative fees in direct contravention of the terms of Spark's customer contract.

6.     As a result, consumers are being fleeced millions of dollars in exorbitant charges for electricity.  Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

7.      This suit is brought pursuant to common law on behalf of a class of consumers who purchased electricity on a variable rate from Defendant from April 19, 2011 to the present. This suit is also brought pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.* and the common law on behalf of a sub-class of Spark residential customers in Illinois who were charged a variable rate for electricity by Spark from March 2009 to the present. It seeks, *inter alia*, injunctive relief, actual damages and refunds, treble damages, punitive damages, attorneys' fees, and the costs of this suit.

## PARTIES

8.      Plaintiff Janet Rolland is a citizen of New Jersey residing in Trenton, New Jersey. Ms. Rolland was a Spark customer for electricity from February 2012 to December 2014. As a result of Defendant's deceptive conduct, Ms. Rolland incurred excessive charges for electricity.

9.      Plaintiff Michael Harty is a citizen of Illinois residing in Mount Prospect, Illinois. Mr. Harty was a Spark Energy customer for electricity from approximately February 2012 to approximately November 2018 (when Mr. Harty realized that he was being overcharged). As a result of Defendant's deceptive and unfair conduct, Mr. Harty incurred excessive charges for electricity.

10.      Defendant Spark Energy, LLC is a limited liability company organized under the laws of Texas, with its principal place of business in Texas. It is a retail energy supplier, providing electricity services to residential customers in the United States, including New Jersey where it is currently licensed to operate. It has thousands of customers in New Jersey and elsewhere, and tens of millions of dollars in revenues. It previously operated as Spark Energy, LP in New Jersey and other states.

## JURISDICTION

11.     Defendant's status as limited liability company renders it an "unincorporated association" pursuant to the Class Action Fairness Act ("CAFA"), and under CAFA, an unincorporated association is a citizen of the state where it has its principal place of business and the state under whose laws it is organized.  *See* 28 U.S.C. § 1332(d)(10).

12.     Subject matter jurisdiction in this civil action is authorized pursuant to 28 U.S.C. § 1332(d), as minimal diversity exists, there are more than 100 class members, and the amount in controversy is in excess of $5 million.

## OPERATIVE FACTS

13.     In 1999 and 2002, New Jersey and Illinois, respectively, deregulated their markets for retail residential electricity supply.  Among the goals of the reorganization were increased competition and deregulation within the industry, with an eye towards achieving greater consumer choice and an overall reduction of energy rates.  As a result, the states' electric industries are open to competition, and consumers may choose their supplier of electricity.

14.     The new energy suppliers, who compete against local utilities such as Public Service Electric and Gas Company ("PSE&G") and Commonwealth Edison ("ComEd"), are known as energy service companies, or "ESCOs."  While ESCOs supply the power, the delivery of electricity to homes remains the job of the local utilities.  The local utility also continues to bill customers for both the energy supply and delivery costs.  The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply.

15.     The public policy motivation for allowing consumers a choice of energy suppliers is to enable retail customers to take advantage of increased competition between suppliers in the open market.  The fundamental purpose behind this policy is that competition would result in

ESCOs being more aggressive and creative than the utility in reducing wholesale purchasing costs and thereby lower prices for retail customers.

16.    Consumers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility.  Utilities charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace, plus other wholesale costs, namely transmission, capacity, ancillary, congestion, and administrative costs (*i.e.*, the same costs ESCOs such as Spark incur) -- without any markup or profit.  Because utility rates do not include any profits, they serve as reflections of market costs of wholesale electricity and associated costs.  The local utility is virtually always an ESCO's primary competitor.

17.    As part of the deregulation plan, ESCOs, such as Defendant, do not have to file the electricity rates they charge or the method by which they set their rates with the New Jersey Board of Public Utilities or the Illinois Commerce Commission.

18.    Additionally, Spark has a tactical advantage over the highly-regulated utilities as it can purchase electricity from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing electricity should at the very least reflect (if not undercut) utility prices.  For example, ESCOs such as Spark may buy electricity at wholesale for resale to retail customers by: owning electricity production facilities; purchasing electricity from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and by purchasing electricity in advance of the time it is used by consumers, for example purchasing futures contracts for the delivery of electricity in the future at a predetermined price.  The purpose of deregulation is to allow ESCOs to use these and other innovative purchasing strategies to reduce electricity costs, and pass those savings on to consumers.

19.     ESCOs should be able to offer rates competitive with, or substantially lower than, utilities' rates, and in fact many do.  Indeed, Spark offered fixed rates during the time Plaintiffs were Spark customers that were competitive with or much lower than utilities' rates.

20.     Therefore, while PSE&G's and ComEd's rates may not precisely match Spark's rates, they should be commensurate.  But they are instead wildly disparate.

21.     Defendant takes advantage of the deregulation and the lack of regulatory oversight in the energy market to deceptively charge consumers exorbitant rates for electricity. In fact, Defendant's rates are not competitive and are in fact substantially higher than rates of other ESCOs and local utilities, not reflective of changes in wholesale markets, and are based on factors other than market conditions that it fails to disclose to its customers.

22.     As any reasonable consumer would expect, there are only two aspects of market conditions that affect Spark's sales of electricity to consumers: supply side, as reflected in the state of wholesale market pricing (wholesale costs make up the vast majority of ESCOs' costs to provide retail electricity), and demand side, as reflected in the rates Spark's competitors charge other retail customers.

## SPARK ENERGY CHARGES DECEPTIVELY HIGH ELECTRICITY RATES

23.     Spark engages in a classic bait-and-switch deceptive scheme.  It lured Ms. Rolland into switching to its electricity supply service by offering her a fixed rate that was lower than her then-current rate with her local utility (PSE&G), and she accepted the offer.  Ms. Rolland stayed on that fixed rate for 12 months before she was switched to Spark's standard variable rate.  Not surprisingly, the rate Spark charged after she was moved to the variable rate was always substantially higher than her initial rate, the rates PSE&G charged, and the rates other electricity retailers charged.

24.     After Ms. Rolland agreed to enroll in Spark's electricity service, Spark provided her its standard "Terms of Service."  Ms. Rolland's Terms of Service and attendant welcome letter are attached as Exhibit 1.  The Terms of Service, which is the contract between Ms. Rolland and Spark, provided for a rescission period during which it was not effective.  Thus, the Terms of Service constituted a representation as to what rate Ms. Rolland would receive when she was placed on the variable rate.

25.     The Terms of Service further provides that after the expiration of the initial fixed rate, Plaintiff would be switched to a "variable market rate."  Spark also represented that after her fixed rate expired, the new rate may "vary according to market conditions."  That is, Spark represented that the new variable rate might vary from the fixed rate that just expired "according to market conditions."

26.     To induce Plaintiff to allow Spark to switch her to its variable market rate, Spark uses its uniform renewal notice, sent to every Spark customer whose initial rate is expiring, to mislead Plaintiff into believing that Spark's variable rate is competitive with those of the local utility and other ESCOs.  This misleading and deceptive misrepresentation is not part of the Terms of Service or any contract with Plaintiff, but is instead an independent, non-contractual deceptive practice upon which Defendant intended Plaintiff and other class members to rely. Spark thus misleadingly states that its rates are competitive with rates charged by utilities and other ESCOS by representing that its rates are "competitively priced" in its renewal notice, which Spark sends to customers to notify them that their initial rate is set to expire and that their account "will automatically roll onto a month-to-month variable plan with no effort required on your part."  Spark's standard renewal notice, received by Ms. Rolland, is attached as Exhibit 2.

27.     Thus, a reasonable consumer would expect either that the rate would remain the same as the initial rate or that it would vary based on changes in market conditions (namely, wholesale market costs and conditions and the rates charged by other ESCOs and the local utility).

28.     But such a consumer would be wrong, because Spark's variable rate is not a market variable rate because it does not reflect changes in wholesale costs and conditions and it is substantially higher than other rates available to consumers in the market.  And Spark's variable rate does not vary based on changes in wholesale costs or the rates its competitors charge.

29.     In particular, a reasonable consumer would understand and expect that "market conditions" for retail electricity would include the prices that Spark's competitors charge, including Spark's primary competitor PSE&G.  That expectation would be frustrated.

30.     Ms. Rolland was a Spark electricity customer from February 25, 2012 to December 24, 2014.  After the first year of service, she was switched to Spark's variable rate. Immediately, Spark's rate jumped a remarkable 108% from $0.1069 to $0.2220 per kilowatt hour.[1]  In contrast, the local utility (PSE&G) rate, *i.e.*, the rate PSE&G would have charged Ms. Rolland had she purchased electricity from PSE&G, merely increased by 1%.  Spark's variable rates stayed substantially higher than PSE&G rates for the rest of Ms. Rolland's service period. They were higher than PSE&G rates by 93% to 114%.  On average, they were higher by about 105%, with Spark rates averaging $0.2309 kWh and PSE&G rates averaging $0.1127 kWh. From February 26, 2013 through December 24, 2014, when Spark variable rates were in effect, Spark's rates were higher by at least 100% for 17 of the 22 billing periods.  Price disparity was

---

[1] Electricity is sold to consumers by the kilowatt hour, or kWh.

most pronounced from March 27, 2014 through December 24, 2014, when, except for one billing period (June 26, 2014 to July 26, 2014), Spark rates were at least 110% higher than PSE&G rates, with the price disparity reaching its peak at 114% for the billing period April 25, 2014 to May 27, 2014.   Moreover, Spark's variable rate was also consistently substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.

31.     In fact, after the abrupt 108% rate hike on the 13th month of service, the price per kilowatt hour that Spark charged further went up by 8% through the end of the service period, from $0.2220 to $0.2390 kWh, so that for the entire service period, Spark rates increased by about 124% from $0.1069 to $0.2390 kWh.   At no time after the first year of service did Spark charge a variable rate less than $0.2220 kWh.   Remarkably, Spark never lowered its rate from the preceding month, in contrast to fluctuating market conditions, demonstrating that the representation that the rates "may" vary according to market conditions is false and misleading because they never vary according to market conditions.

32.     In contrast, while Spark's rates continued to rise, PSE&G rates showed greater price variability.   For example, from PSE&G's rate dropped from $0.1155 kWh in June 2013 to $0.1097 in January 2014, a decrease of 5%, while Spark's rate remained unchanged at $0.2270 kWh.   Similarly, PSE&G's rate dropped from $0.1202 kWh to $0.1130 from June to December 2014, a 6% decline; Spark's rate did not change.

33.     Spark's variable rates were always significantly higher than PSE&G's after the first year of service; indeed, while PSE&G's rates often declined, Spark's rates increased.   Thus, Spark's rates are not in fact based on market conditions or competing prices otherwise available in the market.

34.     A reasonable consumer would also understand that the price the local utility charges and market rates are part of prevailing market conditions and that a price based on prevailing market conditions would be competitive with the price charged by the local utility and other retail market rates.  But Spark's variable rate was never competitive with PSE&G's rate.

35.     A reasonable consumer would also understand and expect that "market conditions" for retail electricity would include the wholesale price for electricity, that is, the price that Spark pays for the electricity it in turn supplies to its retail customers.

36.     However, Spark's variable rate never varies with wholesale market prices.  One indicator of market prices is the locational marginal price ("LMP"), which is a benchmark used to establish the price of energy purchases and sales in the PJM wholesale electricity market (which includes New Jersey).

37.     The disconnect between changes in the PJM and Spark variable rate demonstrates that Spark's rates never reflect changes in market conditions.  For example, when Spark's variable rate took effect on the 13th month of the service period, the weighted LMP had declined from $0.0492 to $0.0419 kWh (January 25 to March 26, 2013), a *reduction* of about 15%.  Yet during that same period, Spark's rate had jumped from $0.1069 to $0.2220 kWh, a drastic *increase* of about 108%.  Similarly, from June 27 to August 23, 2013, the weighted LMP had declined from $0.0593 to $0.0381 kWh, a *reduction* of about 36%.  Yet during that same period, Spark's variable rate had *increased* by 1.93% from $0.2227 to $0.2270 kWh.  Then from January 25 to May 27, 2014, the weighted LMP had *decreased* by 57% from $0.0913 to $0.0393 kWh, while Spark's rate had *increased* by 4.64% from $0.2284 to $0.2390 kWh.  Then Spark's rate stayed at $0.2390 for the rest of the service period notwithstanding declines in the weighted LMP of nearly 22% from $0.0428 to $0.0335 kWh, (June 26 to August 25, 2014), of about 8% from

10

0.0343 to 0.0315 kWh (August 26 to October 23, 2014), and of about 21.50% from $0.0424 to

$0.0333 kWh (October 24 to December 24, 2014).  Indeed, after the first year of service, Spark's

rate increased by about 8% from $0.2220 to $0.2390 kWh, although the weighted LMP

decreased by about 21% from $0.0419 to $0.0333 kWh.  No reasonable consumer who is told

that their variable rate may vary according to market conditions would expect that Spark's rate

would consistently increase despite decreases in the wholesale price of electricity.

38.      Moreover, as Defendant Spark's Rule 30(b)(6) witness Ms. Kira Jordan (Senior

Director of Portfolio Management at Spark) testified,



40.      Not surprisingly, Spark's rates are not competitive with those of other New Jersey

ESCOs.  *See 2016 Retail Power Marketers Sales -- Residential*, U.S. ENERGY INFORMATION

ADMINISTRATION, http://bit.ly/2pgWXpO (last visited Aug. 14, 2018).  In fact, according to U.S.

Energy Information Administration's data, in 2016, Spark's rates were higher than

approximately 90% of the 68 ESCOs providing residential electricity services in New Jersey.

*See id.*

41.      Mr. Harty's experience with Spark mirrored that of Ms. Rolland.

42.     In or around February 2012, Spark offered to provide Mr. Harty a fixed rate to be followed by a market-based variable rate for electricity services.  Spark's fixed rate offer was lower than his local utility's (ComEd) then-current rate.

43.     After Mr. Harty expressed interest in enrolling in Spark's electricity services, Spark provided him with its standard customer Uniform Disclosure Statement (also referred to as Spark's "Customer Disclosure Statement") and Terms of Service.

44.     The representation that Defendant's variable rate would be based on market conditions was reinforced by Defendant's standard Terms of Service, which, after the rescission period, would come to govern their relationship.  Specifically, the Terms of Service prominently stated that, upon the expiration of the initial fixed rate, Plaintiff would be automatically transferred to Spark's variable rate plan, "where your rate may vary according to market conditions."  That is, Spark represented that the new variable rate "may vary" from the expired fixed rate "according to market conditions."

45.     The Terms of Service also provided Mr. Harty with a rescissionary period during which he could rescind the contract prior to its commencement should he not agree to its terms.  During that rescissionary period, the contract served as a solicitation in which Defendant identified the basis upon which the promised market-based variable rate would be determined.

46.     Spark sends a uniform renewal letter to all of its customers whose fixed rates are expiring, in which it represents that Spark has "competitively priced offers."

47.      Any reasonable consumer would understand based on these representations that Defendant's variable rate would be competitive and vary from the initial fixed rate according to changes in market conditions.  Any reasonable consumer would understand that the primary, if not sole, components of market conditions is wholesale prices and the retail prices other

12

competitors (namely the local utility and other ESCOs) charge.  Mr. Harty thus reasonably expected that Spark's variable rates for electricity would only vary from his initial rate based on market conditions, *i.e.*, the rates Spark's competitors charge and wholesale costs for purchasing electricity.

48.     But such a consumer would be wrong, because Spark's variable rate does not reflect changes in wholesale electricity prices and it is invariably substantially higher than competitors' rates.

49.     The following table identifies the last 23 billing periods (beginning in January 2017) during which Mr. Harty was enrolled in Spark's electricity services, the variable rate Spark charged Mr. Harty, the corresponding rate ComEd would have charged (which, as discussed above, is a reasonable representation of a rate based on wholesale market conditions), and the differences between Spark's and ComEd's contemporaneous rates:

| Billing Period | Spark Energy Rate Per kWh | ComEd Rate Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 1/4/17 – 2/3/17 | $0.1309 | $0.05818 | $0.07272 | 124.99% |
| 2/3/17 – 3/6/17 | $0.1309 | $0.05818 | $0.07272 | 124.99% |
| 3/6/17 – 4/4/17 | $0.1309 | $0.06185 | $0.06905 | 111.64% |
| 4/4/17 – 5/3/17 | $0.1409 | $0.05818 | $0.08272 | 142.18% |
| 5/3/17 – 6/2/17 | $0.1409 | $0.06161 | $0.07929 | 128.70% |
| 6/2/17 – 7/3/17 | $0.14089 | $0.07044 | $0.07045 | 100.01% |
| 7/3/17 – 8/2/17 | $0.13993 | $0.06969 | $0.07024 | 100.79% |
| 8/2/17 – 8/31/17 | $0.13991 | $0.07082 | $0.06909 | 97.56% |
| 8/31/17 – 9/29/17 | $0.1399 | $0.07103 | $0.06887 | 96.96% |
| 9/29/17 – 10/30/17 | $0.13991 | $0.06649 | $0.07342 | 110.42% |
| 10/30/17 – 11/30/17 | $0.1399 | $0.06649 | $0.07341 | 110.41% |
| 11/30/17 – 1/3/18 | $0.13989 | $0.06649 | $0.0734 | 110.39% |
| 1/3/18 – 2/2/18 | $0.1399 | $0.06786 | $0.07204 | 106.16% |
| 2/2/18 – 3/5/18 | $0.15088 | $0.07485 | $0.07603 | 101.58% |
| 3/5/18 – 4/3/18 | $0.1599 | $0.06898 | $0.09092 | 131.81% |
| 4/3/18 – 5/2/18 | $0.1599 | $0.06695 | $0.09295 | 138.83% |
| 5/2/18 – 6/1/18 | $0.1599 | $0.06818 | $0.09172 | 134.53% |
| 6/1/18 – 7/2/18 | $0.1599 | $0.07334 | $0.08656 | 118.03% |
| 7/2/18 – 8/1/18 | $0.1599 | $0.07051 | $0.08939 | 126.78% |
| 8/1/18 – 8/30/18 | $0.15989 | $0.0727 | $0.08719 | 119.93% |
| 8/30/18 – 10/1/18 | $0.1599 | $0.06993 | $0.08997 | 128.66% |
| 10/1/18 – 10/30/18 | $0.1599 | $0.06792 | $0.09198 | 135.42% |
| 10/30/18 – 11/30/18 | $0.15989 | $0.06792 | $0.09197 | 135.41% |

50.     As explained above, ComEd is Spark's primary competitor in Mr. Harty's service

territory.

14

51.     In Illinois, the Illinois Power Agency develops electricity procurement plans and conducts competitive electricity procurement processes on behalf of Illinois utilities in order to ensure that utility customers receive competitive retail rates for electricity.  A third-party consultant manages competitive procurement auctions on behalf of the Illinois Power Agency. Through these events, utilities purchase electricity at competitive wholesale prices on a multi-year rolling basis (which Illinois refers to as a "laddered" approach) on behalf of its customers. The bidding processes and results are made publicly available.  As a result, these auctions reflect market-determined prices based on prevailing market conditions.  Utilities then charge their customers a rate based on market prices for supply obtained in the competitive wholesale marketplace.  Because Illinois utility rates do not include any profits, they serve as pure reflections of average market costs of wholesale electricity and associated costs over time.

52.     Thus, ComEd's rates encompass the average wholesale price of electricity over time and associated costs without any markup, making it an ideal comparator.

53.     That Spark's variable rate is not in fact a competitive market rate is demonstrated by the fact that Defendant's rate was consistently significantly higher than ComEd's rates. Between January 2017 and November 2018, Spark's rate was higher than ComEd's rate *every single month*.  On average, during this period, Spark's rates were 119% higher than ComEd's rates.  Spark's rate was *more than double* ComEd's rate during 21 of these 23 months.

54.     Spark's failure to base is variable rate on market conditions is likewise evidenced by the variable rate's failure to fluctuate in accordance with changes in ComEd's (*i.e.*, its primary competitor's) rate.

55.     Remarkably, Spark almost never lowered its rate from the preceding month, in contrast to fluctuating market conditions, demonstrating that the representation that the rates

"may" vary according to market conditions is false and misleading because they rarely if ever vary according to market conditions.

56.     The discrepancies between fluctuations in Spark's variable rate and utility prices remain evident throughout Mr. Harty's last two years on the variable rate.  For example, whereas ComEd's rate decreased from $0.07485 to $0.06695 per kWh (declining by 11%) from February to April 2018, Spark's rate increased its already exorbitant rate from $0.15088 to $0.1599 per kWh (increasing by 6%).  Likewise, between August and November 2018, ComEd's rate steadily decreased from $0.0727 to $0.06792 per kWh (decreasing 7%), while Spark's rate increased from $0.1589 to $0.1599 per kWh and subsequently decreased back to $0.1589 per kWh during the same period.

57.     Even when the rates trended in the same direction, the differences remain evident. For instance, between August and December 2017, ComEd's rate steadily decreased from $0.07103 to $0.06649 per kWh (decreasing 6%), whereas Spark's rate nominally decreased from $0.1399 per kWh to $0.1389 per kWh (decreasing 0.7%).

58.     A reasonable consumer would understand that a price based on market conditions would be competitive with the price charged by Spark's competitors' rates, namely its primary competitor ComEd.  But Spark's variable rate was never competitive with ComEd's rate.  Thus, Spark's rates are not in fact based on market conditions or competing prices otherwise available in the market.

59.     Moreover, Spark has a tactical advantage over the utility as it can purchase electricity from any number of markets using any number of purchasing and hedging strategies, and therefore its cost for purchasing electricity should at the very least reflect -- if not undercut -- utility prices.

60.    Instead, Spark's rates are unfathomably and consistently higher than the local utility's rates.

61.    Spark's variable rate was also consistently substantially higher than other electricity rates available in the market, including its own fixed rates and introductory rates.

62.    Not surprisingly, Spark's rates are not competitive with those of other Illinois ESCOs either.  In fact, according to U.S. Energy Information Administration's data, in 2016, Spark's rates were higher than approximately 92% of the 52 ESCOs providing residential electricity services in Illinois.  *See 2016 Retail Power Marketers Sales -- Residential*, U.S. ENERGY INFORMATION ADMINISTRATION, http://bit.ly/2pgWXpO (last visited Feb. 27, 2019).

63.    A reasonable consumer would also understand and expect that "market conditions" for retail electricity would include the wholesale price for electricity, that is, the market price available to Spark for the electricity it in turn supplies to its retail customers.

64.    However, Spark's variable rate never varies with wholesale market prices.

65.    The following table identifies the most recent 23 billing periods during which Mr. Harty was enrolled in Spark's variable rate, Spark's variable rates for that period, the "Weighted LMP Plus Other Wholesale Costs," and the differences between Spark's rates and contemporaneous wholesale prices.  The "Weighted LMP Plus Other Wholesale Costs" below reflects the Day-Ahead LMP adjusted upward to reflect that more electricity is purchased when demand, and consequently the LMPs, are higher, and also includes the other wholesale costs an ESCO incurs for selling electricity (namely transmission, capacity, ancillary, and congestion costs) in ComEd's service territory.  PJM is the market administrator and updates the market rate on an hourly basis.  Spark was and is capable of purchasing electricity at wholesale at these prices.

| Billing Period | Spark Energy Rate Per kWh | Weighted LMP Plus Other Wholesale Costs Per kWh | Difference Per kWh | Percent Difference |
|---|---|---|---|---|
| 1/4/17 – 2/3/17 | $0.1309 | $0.0667 | $0.0642 | 96% |
| 2/3/17 – 3/6/17 | $0.1309 | $0.0442 | $0.0867 | 196% |
| 3/6/17 – 4/4/17 | $0.1309 | $0.0505 | $0.0804 | 159% |
| 4/4/17 – 5/3/17 | $0.1409 | $0.0443 | $0.0966 | 218% |
| 5/3/17 – 6/2/17 | $0.1409 | $0.0488 | $0.0921 | 189% |
| 6/2/17 – 7/3/17 | $0.14089 | $0.0506 | $0.0903 | 178% |
| 7/3/17 – 8/2/17 | $0.13993 | $0.0519 | $0.0881 | 170% |
| 8/2/17 – 8/31/17 | $0.13991 | $0.0466 | $0.0933 | 200% |
| 8/31/17 – 9/29/17 | $0.1399 | $0.0460 | $0.0939 | 204% |
| 9/29/17 – 10/30/17 | $0.13991 | $0.0455 | $0.0944 | 208% |
| 10/30/17 – 11/30/17 | $0.1399 | $0.0423 | $0.0976 | 231% |
| 11/30/17 – 1/3/18 | $0.13989 | $0.0432 | $0.0967 | 224% |
| 1/3/18 – 2/2/18 | $0.1399 | $0.0397 | $0.1002 | 252% |
| 2/2/18 – 3/5/18 | $0.15088 | $0.0386 | $0.1123 | 291% |
| 3/5/18 – 4/3/18 | $0.1599 | $0.0429 | $0.1170 | 273% |
| 4/3/18 – 5/2/18 | $0.1599 | $0.0454 | $0.1145 | 252% |
| 5/2/18 – 6/1/18 | $0.1599 | $0.0378 | $0.1221 | 323% |
| 6/1/18 – 7/2/18 | $0.1599 | $0.0437 | $0.1162 | 266% |
| 7/2/18 – 8/1/18 | $0.1599 | $0.0492 | $0.1107 | 225% |
| 8/1/18 – 8/30/18 | $0.15989 | $0.0493 | $0.1106 | 224% |
| 8/30/18 – 10/1/18 | $0.1599 | $0.0487 | $0.1112 | 228% |
| 10/1/18 – 10/30/18 | $0.1599 | $0.0462 | $0.1137 | 246% |
| 10/30/18 – 11/30/18 | $0.15989 | $0.0538 | $0.1061 | 197% |

66.     The disconnect between changes in wholesale prices and Spark's variable rate demonstrates that Spark's rates do not reflect changes in market conditions.  For example, the wholesale price of electricity significantly declined from $0.0519 per kWh in July 2017 to $0.0386 per kWh in February 2018, a reduction of 26%, while Spark's rates remained constant around $0.1399 throughout the eight-month period.  Likewise, between March and May 2018, wholesale prices declined from $0.0429 to $0.0378 per kwh, declining 12%, while Spark's rate remained at $0.1599 per kwh.  The discordance remained evident through Mr. Harty's final months with Spark.  Between August and October 2018, wholesale costs decreased from $0.0493 to $0.0462, decreasing by 6%, while Spark's variable rate increased from $0.1589 to $0.1599 per kwh.

67.     No reasonable consumer who is told that their variable rate may vary according to market conditions would expect that Spark's rate would consistently remain constant or increase despite decreases in the wholesale price of electricity.

68.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████.

69.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

70.     Spark further deceives its variable rate customers by charging them monthly

administrative fees in direct contravention of the terms of Spark's contract.

71.     According to Spark's standard Terms of Service, "[y]ou may also pay a monthly

administrative fee, the amount of which, if applicable, is disclosed in your CDS [Customer

Disclosure Statement] or Electric Service Agreement."  Exhibit 1 at 3, § 1.

72.     However, Spark's standard Customer Disclosure Statement explicitly states,

"Monthly Administrative Fee: None."  *See* Exhibit 1 at 2; *accord* Jordan Dep. Tr. 138.

Furthermore, as Ms. Jordan conceded, Spark customers transferred from Spark's Fixed Rate Plan

and Immediate Savings Plan -- the only two initial plan offerings, both of which automatically

transfer to the variable rate -- do not receive a new contract upon transfer that would otherwise

have disclosed an applicable monthly administrative fee.  *See* Jordan Dep. Tr. 140:10-22;

142:21-143:6.  Notwithstanding the explicit terms of their agreement with Spark, soon after

shifting Plaintiffs to its variable rate, Spark intentionally began charging Ms. Rolland and Mr.

Harty a monthly administrative fee.  Spark knows when it represents that no fee will be charged

absent a Customer Disclosure Statement or Electronic Service Agreement disclosure that it will

in fact charge such a fee, irrespective of whether it is disclosed.

73.     All that Spark offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCOs or local utilities.  Other than potential price savings, Spark offers nothing of value that other ESCOs or local utilities do not offer.

74.     Spark's statements regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer who knows the truth about Spark's exorbitant rates would choose Spark as an electricity supplier.  All that Spark offers customers is electricity delivered by local utilities, a commodity that has the exact same qualities as electricity supplied by other ESCOs or local utilities.  Other than potential price savings, there is nothing to differentiate Spark from other ESCOs or local utilities, and the potential for price savings is the only reason any reasonable consumer would enter into a contract for electricity supply with Spark.

75.     Spark knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing customers to purchase electricity from Spark so that it can reap outrageous profits to the direct detriment of consumers without regard to the consequences high utility bills cause such consumers.  Therefore, Spark's actions were actuated by actual malice or accompanied by wanton and willful disregard for the well-being of consumers.

## **RULE 9(B) ALLEGATIONS**

76.     Federal Rule of Civil Procedure ("Rule") 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Fed. R. Civ. P. 9(b).  To the extent necessary, as detailed in the paragraphs above and below, Plaintiffs have satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity:

77.   WHO:

- Spark, acting through its corporate personnel, makes material misrepresentations and omissions of fact in the marketing, advertising, promotion, and sale of electricity.

78.   WHAT:

- Spark makes material misrepresentations and omissions by marketing, advertising, promoting, and selling its variable rate as a "competitively priced" "variable market rate" that "may vary according to market conditions."

- The language that Spark uses in its Terms of Service and renewal letters falsely and deceptively creates the impression that its variable rate would vary based on changes in the wholesale cost of electricity and competitors' rates. ██████

██████████████████████████████████

██████████████████████████████████

████████████████████████████

█████████████████████████████████

███████████████████████████

- ███████████████████████████████

████████████████████████████████████

█████████████████████████████

██████████████████████████

▉▉▉▉▉▉▉▉▉▉▉▉▉▉ No reasonable consumer exposed to Spark's representations would expect that there would be no connection between market conditions and Spark's variable rates.

- Spark engages in additional misrepresentations and omissions in its Terms of Service by falsely and deceptively stating that, "[y]ou may also pay a monthly administrative fee, the amount of which, if applicable, is disclosed in your CDS [Customer Disclosure Statement] or Electric Service Agreement." Notwithstanding, Spark knows that it will charge customers a monthly administrative fee without first disclosing the fee in either the Customer Disclosure Statement or Electric Service Agreement.

79.   WHERE:

- In Spark's standard Customer Disclosure Statement and Terms of Service, which constitute a solicitation during the rescission period, and in Spark's standard renewal notice, all of which were received by Plaintiffs and upon which Spark intended Plaintiffs to rely.

80.   WHEN:

- Spark made the material misrepresentations and omissions when it solicited Ms. Rolland in February of 2012 by providing her with its deceptive standard Customer Disclosure Statement and Terms of Service, and again in or around March of 2013 when it sent Ms. Rolland its standard renewal notice guaranteeing "competitively priced" rates.  Spark Energy likewise made the material misrepresentations and omissions when it solicited Mr. Harty in February of 2012 by providing him with its deceptive standard Uniform Disclosure Statement and

Terms of Service, and again when it sent Mr. Harty its standard renewal notice guaranteeing competitively-priced rates. According to Ms. Jordan's testimony, Spark makes the same or substantially similar misrepresentations and omissions of material facts to all of its potential customers when it solicits them by using the same or substantially similar Customer Disclosure Statement, Terms of Service, and renewal notice. Jordan Dep. Tr. 176:16-180:11; 184:3-16.

81. WHY:

- Knowing that price is the most fundamental factor in choosing an energy supplier, Spark makes these claims with respect to its variable rate with the purpose of inducing Ms. Rolland, Mr. Harty, and other prospective customers to switch to its electricity supply services. By deceptively inducing customers to switch to its energy supply, Spark has successfully reaped millions in profits at the expense of its unsuspecting customers.

82. HOW:

- Spark makes material misrepresentations and fails to disclose material facts concerning its variable rate when marketing, advertising, promoting, and selling its electricity services by representing that its variable rate is a "competitively priced" "variable market rate" that "may vary according to market conditions." ■ ███████████████████████████████ ███████████████████████████████ ███████████████████ Instead, Spark's rate is consistently higher than that of its primary competitor (the local utility) as well as rates charged by other ESCOs, and is invariably higher than its own teaser and fixed

rates. 

- Spark also fails to disclose that it charges customers a monthly administrative fee, despite its explicit representations otherwise.

## CLASS ACTION ALLEGATIONS

83.     Plaintiffs bring this action individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class of all Spark variable rate electricity customers nationwide from April 19, 2011 to the present (the "Class").

84.     Plaintiff Harty further brings this action individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a sub-class of Spark customers in Illinois who were charged a variable rate for residential electricity services by Spark from March 2009 to the present (the "Sub-Class", collectively, the "Classes").

85.     Excluded from the Classes are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

86.     This action is brought as a class action for the following reasons:

a.      The Classes consist of thousands of persons and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable;

b.      There are questions of law or fact common to the Classes that predominate over any questions affecting only individual members, including:

    i.  whether Defendant breached its contracts with consumers by charging variable rates not based on market conditions;

    ii.  whether Defendant breached the covenant of good faith and fair dealing by exercising its unilateral price-setting discretion in bad faith, *i.e.*, to price gouge or upset the reasonable expectation of consumers that Spark variable rates would be competitive and reflect changes in the wholesale price of electricity;

    iii.  whether Defendant violated 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*;

    iv.  whether Plaintiffs and the Classes have sustained damages and, if so, the proper measure thereof; and

    v.  whether Defendant should be enjoined from continuing to charge exorbitant rates based on factors other than market conditions.

  c.  The claims asserted by Plaintiffs are typical of the claims of the members of the Class;

  d.  Plaintiffs will fairly and adequately protect the interests of the Classes, and Plaintiffs have retained attorneys experienced in class and complex litigation, including class litigation involving consumer protection and ESCOs;

  e.  Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendant;

  f.  Defendant has acted on grounds that apply generally to the Classes, namely representing that its variable rates are based on market conditions when its rates are in

fact always substantially higher, so that final injunctive relief prohibiting Defendant from continuing its deceptive practices is appropriate with respect to the Classes as a whole;

      g.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

      i.    Absent a class action, Class members as a practical matter will be unable to obtain redress, Defendant's violations of its legal obligations will continue without remedy, additional consumers and purchasers will be harmed, and Defendant will continue to retain its ill-gotten gains;

      ii.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions;

      iii.    When the liability of Defendant has been adjudicated, the Court will be able to determine the claims of all members of the Classes;

      iv.    A class action will permit an orderly and expeditious administration of Classes' claims, foster economies of time, effort, and expense, and ensure uniformity of decisions;

      v.    The lawsuit presents no difficulties that would impede its management by the Court as a class action; and

      vi.    Defendant has acted on grounds generally applicable to Class and Sub-Class members, making class-wide monetary and injunctive relief appropriate.

87.    Defendant's violations the common law are applicable to all members of the Class, Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act are applicable to all members of the Sub-Class, and Plaintiffs are entitled to have Defendant enjoined from engaging in illegal and deceptive conduct in the future.

## FIRST CAUSE OF ACTION
### Breach of Contract
### (On Behalf of the Class)

88.     Plaintiffs repeat and re-allege the allegations contained in the preceding paragraphs as if fully set forth herein.

89.     Plaintiffs and the Class entered into valid contracts with Defendant for the provision of electricity supply.

90.     Pursuant to that contract, Spark agreed to charge a variable rate for electricity "according to market conditions."

91.     Defendant also promised that it would not charge customers a monthly administrative fee without prior disclosure in its Uniform Disclosure Statement or Electric Service Agreement.

92.     Pursuant to the contract, Plaintiffs and the Class agreed to pay Defendant's rate, and they did so.

93.     However, Defendant failed to perform its obligations under the contract because it charged a variable rate neither based on market conditions, including the wholesale price of energy.

94.     Defendant further breached its contract by charging Plaintiffs and the Class monthly administrative fees in direct contravention of the terms of Spark's customer contract.

95.     Plaintiffs and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based the rate on market conditions, including the wholesale price of energy, as well as monthly administrative fees.

96.     By reason of the foregoing, Defendant is liable to Plaintiffs and the rest of the

Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith & Fair Dealing
### (On Behalf of the Class)

97.     Plaintiffs repeat and re-allege the allegations contained in the paragraphs above as if fully set forth herein.

98.     Every contract contains an implied covenant of good faith and fair dealing in the performance and enforcement of the contract.  The implied covenant is an independent duty and may be breached even if there is no breach of a contract's express terms.

99.     Under its agreements, Defendant had unilateral discretion to set the variable rate for electricity based on market conditions, including the wholesale price of energy.

100.     Plaintiffs reasonably expected that Defendant would attempt to make a reasonable profit in setting its rates and selling electricity to consumers.  Nonetheless, Plaintiffs reasonably expected that the variable rates for electricity would, notwithstanding Defendant's profit goals, reflect market conditions, including competing rates and the wholesale price of electricity, and that Defendant would refrain from price gouging.  Without these reasonable expectations, Plaintiffs and other Class members would not have agreed to buy electricity from Defendant.

101.     Defendant breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate Plaintiffs and other Class members' reasonable expectations that the variable rate for electricity would reflect market conditions, including competing rates and the wholesale price of electricity.

102.     As a result of Defendant's breach, Defendant is liable to Plaintiffs and other Class

members for actual damages in an amount to be determined at trial and attorney's fees.

### THIRD CAUSE OF ACTION
### Violation of 815 Ill. Comp. Stat. Ann. § 505/1 *et seq.*
### (On Behalf of the Sub-Class)

103.     Plaintiff Harty repeats and re-alleges the allegations contained in the preceding

paragraphs as if fully set forth herein.

104.     The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits,

*inter alia*:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . .

815 Ill. Comp. Stat. Ann. § 505/2.

105.     Defendant's unfair and false, deceptive, and misleading statements and omissions

with respect to the rates charged for electricity, as described above, constitute affirmative

misrepresentations in connection with the marketing, advertising, promotion, and sale of

electricity in violation of the Consumer Fraud and Deceptive Business Practices Act.

106.     Defendant's unfair and false, deceptive, and misleading statements and omissions

would have been material to any potential consumer's decision to purchase electricity from

Defendant.

107.     Defendant also failed to inform customers that its rates are substantially higher

than those based on market conditions.  Defendant further failed to disclose that its variable rates

were artificially inflated to maximize profits at the expense of its customers.  That information

would have been material to any consumer deciding whether to purchase electricity from

Defendant.

30

108.    Additionally, Spark unfairly, falsely, deceptively, and misleadingly promised that it would not charge its customers a monthly administrative fee without first disclosing the fee in either the Uniform Disclosure Statement or Electric Service Agreement.

109.    Notwithstanding, Spark charged customers a monthly administrative fee without first disclosing the fee in either the Uniform Disclosure Statement or Electric Service Agreement.

110.    Defendant made these unfair, false, deceptive, and misleading statements and omissions with the intent that consumers rely upon such statements.

111.    Defendant's price gouging scheme, which often affects Illinois' most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.  Victims of Spark's scheme cannot avoid it; once Spark has charged its exorbitant rate, consumers can only pay the amount charged or risk having their electricity shut off.  In Illinois, this can be a life-threatening issue in the depths of the summer and winter.  Moreover, Spark's customers are not informed that Spark is price gouging them, and reasonable consumers paying a market-based variable rate trust that the ESCO providing them service will not charge a rate divorced from market conditions about which they are not, as private individuals, ordinarily privy.  That Spark's rates are higher than rates charged by 9 out of 10 other ESCOs proves how its roguish behavior is outside of the commercial norm.

112.    Defendant's price gouging scheme offends public policy as well.  The purpose of deregulation is to allow ESCOs like Spark to offer competitive rates to the benefit of consumers. Spark offers nothing of value to consumers; instead, it callously takes advantage of deregulation, and the difficulty consumers face in determining when market conditions change such that a market variable rate should be higher or lower, to charge outrageously high rates, secure in the knowledge that the public utility commission no longer has the authority to curb its behavior.

113.    Spark's price gouging behavior causes consumers significant and substantial pecuniary injury.

114.    Plaintiff and other Sub-Class members entered into agreements to purchase electricity from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the Consumer Fraud and Deceptive Business Practices Act.

115.    As a consequence of Defendant's wrongful actions, Plaintiff and the other Sub-Class members suffered an ascertainable monetary loss based on the difference in the rate they were charged versus the rate they would have been charged had Defendant charged a competitive rate based on market conditions or had they not switched to Defendant from their previous supplier, and well as any monthly fees assessed by Defendant.

116.    Plaintiff and other Sub-Class members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates and fees had been known.

117.    By reason of the foregoing, Defendant is liable to Plaintiff and Sub-Class members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

118.    Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations it makes with regard to the rates being based on market conditions were made for the sole purpose of inducing consumers to purchase electricity from it so it can reap outrageous profits to the direct detriment of Illinois consumers and without regard to the consequences high utility bills cause such consumers.  Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and

32

reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Sub-Class Members.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### Violation of 815 Ill. Comp. Stat. Ann. § 505/2GG
### (On Behalf of the Sub-Class)

119.    Plaintiff Harty repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth herein.

120.    The Illinois Consumer Fraud and Deceptive Business Practices Act requires that "[a]ny advertisement for electric service that lists rates shall clearly and conspicuously disclose all associated costs for such service including, but not limited to, access fees and service fees." 815 Ill. Comp. Stat. Ann. § 505/2GG.

121.    "The term 'advertisement' includes the attempt by publication, dissemination, solicitation or circulation to induce directly or indirectly any person to enter into any obligation or acquire any title or interest in any merchandise and includes every work device to disguise any form of business solicitation by using such terms as 'renewal', 'invoice", 'bill', 'statement', or 'reminder', to create an impression of existing obligation when there is none, or other language to mislead any person in relation to any sought after commercial transaction."  815 Ill. Comp. Stat. Ann. 505/1(a).

122.    During the rescissionary period, Spark's Uniform Disclosure Statement and Terms of Service serves as a solicitation in which Defendant identifies the purported market-based pricing methodology for its variable rate.  The solicitation further represents that Spark will not charge customers administrative fees absent a Uniform Disclosure Statement or Electronic Service Agreement disclosure that it will in fact charge such fees.

123.     Defendant's solicitations failed to clearly and conspicuously disclose Spark's variable rate pricing methodology and associated costs for electricity services including, *inter alia*, its administrative fees.

124.     Plaintiff and other Sub-Class members suffered an ascertainable loss caused by Defendant's unfair misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates and fees had been known.

125.     By reason of the foregoing, Defendant is liable to Plaintiff and other Sub-Class members for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit.  815 Ill. Comp. Stat. Ann. § 505/10(a).

126.     Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Sub-Class members.  Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that the Court should enter judgment against Defendant as follows:

1.     Certifying this action as a class action, with classes as defined above;

2.     On Plaintiffs' First Cause of Action, awarding against Defendant damages that Plaintiffs and the other Class members have suffered as a result of Defendant's actions;

3.     On Plaintiffs' Second Cause of Action, awarding against Defendant damages that Plaintiffs and other Class members have suffered as a result of Defendant's actions;

4.      On Plaintiffs' Third Cause of Action, awarding against Defendant damages that Plaintiff Harty and other Sub-Class members have suffered, trebled, and granting appropriate injunctive relief;

5.      On Plaintiffs' Fourth Cause of Action, awarding against Defendant damages that Plaintiff Harty and other Sub-Class members have suffered, trebled, and granting appropriate injunctive relief;

6.      Awarding Plaintiffs and the Classes punitive damages;

7.      Awarding Plaintiffs and the Classes interest, costs and attorneys' fees; and

8.      Awarding Plaintiffs and the Classes such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Federal Rule of Civil Procedure Rule 38, Plaintiffs hereby demand a trial by jury.

Dated:      September 18, 2019
            Roseland, New Jersey

                            **MAZIE, SLATER, KATZ & FREEMAN, LLC**

                    By:     */s/ Matthew R. Mendelsohn*
                            _____
                            Matthew R. Mendelsohn
                            103 Eisenhower Parkway
                            Roseland, NJ 07922
                            Tel: (973) 228-9898
                            Fax: (973) 328-0303
                            mmendelsohn@mskf.net

                            Greg Blankinship (Admitted *Pro Hac Vice*)
                            Chantal Khalil (Admitted *Pro Hac Vice*)
                            **FINKELSTEIN, BLANKINSHIP,**
                            **FREI-PEARSON & GARBER, LLP**
                            445 Hamilton Avenue, Suite 605
                            White Plains, New York 10601
                            Tel: (914) 298-3281
                            Fax: (914) 824-1561
                            gblankinship@fbfglaw.com
                            ckhalil@fbfglaw.com

                            Richard R. Gordon
                            (*Pro Hac Vice* Application Forthcoming)
                            **GORDON LAW OFFICES, LTD.**
                            111 West Washington Street, Suite 1240
                            Chicago, Illinois 60602
                            Tel: (312) 332-5200
                            Fax: (312) 242-4966
                            rrg@gordonlawchicago.com

                            *Attorneys for Plaintiffs and Putative Class*