**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JANET ROLLAND, et al.,

                Plaintiffs,

          v.

SPARK ENERGY, LLC,

                Defendant.

Civil Action No. 17-2680 (MAS) (LHG)

**MEMORANDUM OPINION**
**FILED UNDER TEMPORARY SEAL**

**SHIPP, District Judge**

This matter comes before the Court upon Defendant Spark Energy, LLC's ("Spark") Motion to Partially Dismiss Plaintiffs Janet Rolland ("Rolland") and Michael Harty's ("Harty") (collectively, "Plaintiffs") Third Amended Complaint. (ECF No. 100.) Plaintiffs opposed (ECF No. 103), and Spark replied (ECF No. 111). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Spark's Motion is granted in part and denied in part.

## I.    BACKGROUND[1]

The Third Amended Complaint alleges that Spark "engages in a classic bait-and-switch deceptive marketing scheme aimed at customers hoping to save on the cost of electricity." (TAC ¶ 2, ECF No. 96.) Harty, a citizen of Illinois, was enrolled in Spark's electricity services from

---

[1] The Court writes for the parties, who are familiar with the facts and procedural history of this matter to date. *See Rolland v. Spark Energy, LLC*, No. 17-2680, 2019 WL 1903990 (D.N.J. Apr. 29, 2019). The Court, therefore, recites only the facts necessary to resolve the instant motion.

approximately February 2012 to approximately November 2018. (*Id.* ¶ 9) In or about February 2012, Spark offered Harty a twelve-month fixed rate for electricity services, which "was lower than his local utility's (ComEd) then current-rate." (*Id.* ¶¶ 23, 41, 42.) Once the initial fixed rate expired, Spark indicated it would transition Harty to a month-to-month variable rate plan. (*Id.* ¶ 44.)

Specifically, the Terms of Service provided by Spark stated that: "At the conclusion of any Fixed Term, your plan will convert to a month-to-month variable rate plan unless you elect a different plan. Between 30 and 60 days prior to expiration, Spark Energy will provide you with written notice of your options." (Terms & Conditions *6,[2] Ex. 1 to Def.'s Moving Br., ECF No. 100-2; TAC ¶ 44.) The document further provided that the variable rate plan "may vary according to market conditions." (Terms & Conditions *4; TAC ¶ 44.) In December 2012, Spark sent Harty renewal correspondence informing him that his fixed rate services were ending and that he would be automatically enrolled in the variable rate plan. (*See* Dec. 2012 Correspondence, Ex. 2 to Def.'s Moving Br., ECF No. 100-3; TAC ¶ 46.) The correspondence also indicated that Spark had "competitively priced offers." (Dec. 2012 Correspondence; TAC ¶ 46.)

According to Harty, "[a]ny reasonable consumer would understand based on these representations that [Spark's] variable rate would be competitive" as related to "wholesale prices and the retail prices other competitors (namely the local utility and other [energy service companies ('ESCOs')] charge." (TAC ¶ 47.) Harty alleges he "thus reasonably expected that Spark's variable rates for electricity would only vary from his initial rate based on market conditions, *i.e.*, the rates Spark's competitors charge and wholesale costs for purchasing electricity." (*Id.*) Despite his alleged reasonable expectation, Harty asserts that "Spark's variable rate does not reflect changes

---

[2] Page numbers preceded by an asterisk refer to the page number of the ECF header.

in wholesale electricity prices and it is invariably substantially higher than competitors' rates." (*Id.* ¶ 48.) As evidence, Harty provides a chart that compares ComEd and Spark's rates. (*Id.* at 14.) The chart indicates that between January 2017 and November 2018, "Spark's rates were [on average] 119% higher than ComEd's rates." (*Id.*; *see id.* ¶ 53.) For example, for the January 2017 billing period, Spark's rates were 124.99% higher than ComEd's rates. (*Id.* at 14.) Specifically, Spark charged $0.1309 per kWh while ComEd charged $0.05818. (*See id.*)

On March 27, 2019, Harty filed a putative class action complaint against Spark in the Northern District of Illinois. (Ill. Compl., ECF No. 89-5.) On September 18, 2019, the Court entered an Order consolidating Harty and Roland's actions and granting them leave to file a consolidated complaint. (Order, ECF No. 94.) Plaintiffs filed a four-count Third Amended Complaint that same day. (*See generally* TAC.) Count One alleges breach of contract, Count Two alleges breach of the implied covenant of good faith and fair dealing, and Counts Three and Four allege violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. Ann. § 505.1 *et seq.* (*Id.* ¶¶ 88–126.) On October 14, 2019, Spark moved to dismiss Harty's claims. (ECF No. 100.) On September 1, 2020, the parties advised the Court that they were unable to reach an agreement (ECF No. 123); consequently, the Court reinstated Spark's Motion (ECF No. 124).

## II.  LEGAL STANDARD

A district court conducts a three-part analysis when considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint

3

in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 678). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). The "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Where a plaintiff pleads fraud, the plaintiff "must meet a heightened pleading standard" under Rule 9(b). *Zuniga v. Am. Home Mortg.*, No. 14-2973, 2016 WL 6647932, at *2 (D.N.J. Nov. 8, 2016). "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). "A plaintiff alleging fraud must therefore support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (citation omitted). The purpose of Rule 9(b) is "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of . . . fraudulent behavior." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

4

### III.   **DISCUSSION**[3]

#### A.   **ICFA Claims**

Spark argues that Harty's ICFA claims fail in part because Harty has not adequately pled proximate causation as required under the ICFA. (Def.'s Moving Br. 10, ECF No. 100-1.) Specifically, Spark argues that "Harty does not allege that he was actually deceived by any alleged statement or omission. Indeed, he does not allege that he even read the Customer Agreement or the renewal letter at any time." (*Id.* at 10–11.)

To state a claim under the ICFA, a plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149 (2002). "To show proximate cause, the 'plaintiff must actually be deceived by a statement or omission that is made by the defendant;' the plaintiff cannot rest on vague accusations about inadequate disclosures and resulting price effects in the marketplace." *Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 822 (7th Cir. 2018) (citation omitted).

Here, the Court finds that Harty's ICFA claims fail because Harty has not adequately pled that Spark's representations proximately caused his damages. As Spark correctly notes, Harty does not allege that he read or reviewed the agreement. Instead, Harty alleges that Spark merely "provided" him the documents and then couches his allegations in terms of what a reasonable consumer would expect from Spark's representations. (*see* TAC ¶¶ 43, 47.) But such allegations are not sufficient. The Northern District of Illinois recently dismissed an ICFA claim in a similar case. *See Burger v. Spark Energy Gas, LLC*, No. 19-8231, --- F. Supp. 3d ---, 2020 WL 7353407,

---

[3] The parties do not dispute that Illinois law applies.

at *3 (N.D. Ill. Dec. 15, 2020). In *Burger*, the court noted that "[i]f a consumer has neither seen nor heard [the] statement, then she cannot have relied on the statement and, consequently, cannot prove proximate cause." *Id.* (second alteration in original) (internal quotation marks and citation omitted). Moreover, the *Burger* court found that "[b]ecause [ICFA] requires individualized proof of causation, [the plaintiff's] allegations about what reasonable consumers would expect do not suffice[.]" *Id.* (collecting cases, including *Rolland*, 2019 WL 1903990, at *4 ("the plaintiff did not properly plead the required causal nexus for a New Jersey consumer fraud claim where she did not allege that she 'saw, read, heard, or in any way took [the Terms of Service] into consideration' and instead alleged only that she 'received' a renewal notice, that Spark 'provided her' with the Terms of Service, and what a reasonable consumer would understand the information meant" (alteration in original))). Consequently, because the *Burger* plaintiff did not allege that she "actually read [the documents] or knew what was in them" and instead alleged what reasonable consumers would understand the information meant, the Northern District of Illinois dismissed the plaintiff's ICFA claim. *Id.* This Court reaches the same conclusion and, accordingly, grants Spark's Motion to dismiss Harty's ICFA claims.

**B.    Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing**

Count One alleges that Spark breached its agreement to charge a variable market rate that "may vary according to market conditions[,]" as well as its agreement not to charge a monthly administrative fee without prior disclosure in its Uniform Disclosure Statement or Electric Service Agreement. (TAC ¶¶ 2, 90–91.) The *Burger* court also addressed similar allegations.

In *Burger*, the court found that "the parties' dispute about the meaning of 'market conditions' in the Terms of Service is irrelevant to whether Spark Energy breached the Terms of Service" because the disputed phrase includes the term "may" which is permissive. *Burger*, 2020

6

WL 7353407, at *4. "In other words, Spark Energy did not make any guarantee as to how it would set the rate and instead only stated that it could consider market conditions when exercising its discretion to set the rate." *Id.* (citing in part *Marshall v. Verde Energy USA, Inc.*, No. 18-1344, 2019 WL 1254562, at *4 (D.N.J. Mar. 19, 2019) (Vazquez, J.) ("the word 'may' in the Terms of Service means that Verde could, but was not required to, consider market conditions when setting Plaintiff's rate. Moreover, the *Mercado* court's conclusion goes against the weight of authority in the Third Circuit."). The court observed that the "permissive language distinguished this case from *Local 901*, in which Spark Energy's variable rate plan allegedly stated that the rate '*would* be based on market prices,' which the *Local 901* court treated as leaving Spark Energy without discretion in setting the variable rate." *Id.* (emphasis in original) (citing *IUE-CWA Local 901 v. Spark Energy, LLC*, 440 F. Supp. 3d 969, 974, 979 (N.D. Ind. 2020)). In *Local 901*, the court permitted the breach of contract claim to proceed because of Spark's lack of discretion and "the ambiguity as to the meaning of 'market prices.'" *Id.* (citing *IUE-CWA Local 901*, 440 F. Supp. 3d 979–80). But in *Burger*, similar to the case here, Spark's "discretion was not cabined by 'market conditions[.]'" *Id.* The Court, accordingly, finds that Harty has not plausibly alleged that Spark breached any explicit contractual promise with respect to the variable rate.[4]

The *Burger* court found, however, that the plaintiff did state a breach of contract claim concerning the variable rate based on a breach of the implied duty of good faith and fair dealing. *Id.* at 5. "Although not a standalone claim, the obligation of good faith and fair dealing exists in every contract in Illinois and guides the construction of explicit terms in an agreement." *Id.* (citations omitted). Thus, while Spark correctly notes that Harty may not proceed with an

---

[4] The Court is mindful of its previous decision but in light of the recent case law interpreting the phrase "may vary according to market conditions," decides to adopt the reasoning set forth in *Burger*.

independent cause of action for a breach of the implied covenant of good faith and fair dealing, (*see* Def.'s Moving Br. 23–24), the alleged facts may nevertheless give rise to a breach of contract claim, *Burger*, 2020 WL 7353407, at *5 (citations omitted). To allege a breach of the duty, a plaintiff "must show that the contract vested the opposing party with discretion in performing an obligation under the contract and the opposing party exercised that discretion in bad faith, unreasonably, or in a manner inconsistent with the reasonable expectations of the parties." *Hickman v. Wells Fargo Bank N.A.*, 683 F. Supp. 2d 779, 792 (N.D. Ill. 2010). Here, Harty sufficiently alleges that Spark "breached the implied covenant of good faith and fair dealing by arbitrarily and unreasonably exercising its unilateral rate-setting discretion to price gouge and frustrate [customers'] reasonable expectations that the variable rate for electricity would reflect market conditions[.]" (TAC ¶ 101.) Thus, Harty may proceed with his contract claim concerning the variable rate based on a breach of the implied duty of good faith and fair dealing, although not as a standalone claim. *See Burger*, 2020 WL 7353407, at *5.

Finally, as to the administrative fee issue, Harty alleges that "Spark further deceives its variable rate customers by charging them monthly administrative fees in direct contravention of the terms of Spark's contract." (TAC ¶ 70.) Harty alleges that "[a]ccording to Spark's standard Terms of Service, '[a customer] may also pay a monthly administrative fee, the amount of which, if applicable, is disclosed in [the] CDS [Customer Disclosure Statement] or Electric Service Agreement." (*Id.* ¶ 71 (fourth alteration in original).) Referring to the Customer Disclosure Statement, Harty notes that the "Monthly Administrative Fee" states "None." (*Id.* ¶ 72.) Under similar facts, the *Burger* court found that "[t]hese allegations suffice to set forth a claim for breach of contract with respect to the administrative fee." *Burger*, 2020 WL 7353407, at *5. This Court finds the same.

8

## IV.    CONCLUSION

For the foregoing reasons, Spark's Motion is granted in part and denied in part. The Court will enter an Order consistent with this Memorandum Opinion.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

9